The RADIOLOGY INSTITUTE
AND IMAGING CENTER,
INC., Plaintiff,

v.

NORTH AMERICAN PHILIPS CORPO-
RATION, Philips Medical Systems
North America, Inc., Defendant.

Civil No. 92–1586 (JP).

United States District Court,
D. Puerto Rico.

Feb. 27, 1997.

Nelson Biaggi García, Látimer, Biaggi, Ra-
chid & Godreau, San Juan, PR, for Plaintiff.

Edward M. Borges, O'Neill & Borges, San
Juan, PR, for Defendant.

### OPINION AND ORDER

PIERAS, District Judge.

Properly before the Court are defendant
North America Philips Corporation's
("NAPC") motion for summary judgment
(**docket No. 236**), plaintiff Radiology Insti-
tute and Imaging Center, Inc.'s ("Radiolo-
gy") opposition thereto (**docket Nos. 247–
249**), and NAPC's response to the opposition
(**docket No. 253**). Disparaging Voltaire's ad-
monition that a long dispute means both
parties are wrong, the parties filed a barrage
of unauthorized supplements, replies, supple-
mental responses, responses in opposition to
response replies, and responses in opposition

to opposition responses (see **docket Nos. 256, 257, 266, 267, 274, 276, 277, 281, 286**). As the parties proceeded in their prolificacy heedless of the pleasure of the Court, we will disregard all of these superfluous supplications.

## I. INTRODUCTION

This is a contract action under Puerto Rico law to recover damages plaintiff allegedly suffered in connection with the purchase of a model S–5 magnetic resonance imaging (MRI) unit ("S–5"). Radiology brought this action in May of 1992 against NAPC, Philips Medical Systems North America[1] and Philips Credit.[2] The amended complaint (docket No. 35) contained five counts, asserting the following claims:

1. *NULLIFICATION OF CONTRACT,* against NAPC and Philips Credit, based on defendants' misrepresentations that the S–5 incorporated state-of-the-art technology and was completely upgradeable.

2. *DAMAGES FOR FRAUD,* against NAPC, in connection with NAPC's misrepresentations regarding the capabilities of the S–5.

3. *DAMAGES FOR FRAUD,* against NAPC, in connection with repairs to the S–5.

4. *BREACH OF CONTRACT,* against NAPC, for failure to provide 1) upgrades to the S–5; 2) a technician capable of diagnosing and correcting malfunctions; and 3) a copy of the electrical specifications for the S–5.

5. *VIOLATION OF CREDIT STATUTES,* against Philips Credit Corporation ("PCC"), for collecting interest rates exceeding those provided for in the MRI loan agreement, as well as in other loan agreements plaintiffs had signed in relation to the purchase of other medical equipment.

After nearly five years of legal combat, the only remaining claims are those of Radiology against NAPC for fraud, misrepresentation and breach of contract; all claims between plaintiffs and PCC have been settled. NAPC has moved for summary judgment on the following grounds: 1) Radiology's complaint against NAPC is preempted by the Medical Device Amendments to the Food, Drug and Cosmetic Act ("Act"), 21 U.S.C. §§ 301–392; 2) Radiology's claim for rescission of contract against NAPC is without merit because there is no privity of contract between NAPC and Radiology; 3) Radiology's claim for breach of contract is actually a breach of warranty for hidden defects and is time-barred; 4) Radiology's claim for fraud is actually a tort action that is time-barred because its extrajudicial demands were inadequate to toll the one-year statute of limitations; and 5) public policy favors dismissal of the fraud claim. Radiology counters that 1) the Supreme Court's decision in *Medtronic, Inc. v. Lohr,* —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) precludes defendant's preemption argument; 2) it has a valid contract with NAPC and any contract between NAPC and PCC cannot prejudice its rights thereunder; 3) its action is for deceit ("dolo") and not for hidden defects; 4) its cause of action sounds in contract and is governed by a fifteen-year statute of limitations; and 5) the public policy of Puerto Rico does not favor dismissal of the fraud claim.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment in a case where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. Univ. of P.R.,* 864 F.2d 881, 894 (1st Cir.1988).

Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists. *Kennedy v. Josephthal &*

---

1. Philips Medical Systems of North America is currently a division of NAPC. We refer to both entities collectively as "NAPC."

2. Formerly Hundred East Credit Corporation.

*Co., Inc.*, 814 F.2d 798, 804 (1st Cir.1987). A "genuine" issue is one that is dispositive, and which consequently must be decided at trial. *Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A material fact, which is defined by the substantive law, Is one which affects the outcome of the suit and which must be resolved before attending to related legal issues. *Mack*, 871 F.2d at 181.

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the non-movant to provide the Court, through the filing of supporting affidavits or otherwise, with "some indication that he can produce the quantum of evidence [necessary] to enable him to reach the jury with his claim." *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The non-movant cannot rest upon mere allegations or denial of the pleadings. Fed.R.Civ.P. 56(e). Indeed, the non-movant must affirmatively show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

## III. UNCONTESTED FACTS

1. The S–5 MRI unit was originally classified as a Class III device by the Food and Drug Administration ("FDA"), and the S–5 and the S–15 machines went through the entire Class III premarket approval process. On August 14, 1986, the FDA approved the NAPC's premarket approval application for the Gyroscan S–5 and S–15 MRI systems.

2. The parties signed a document entitled "Gyroscan Quotation," dated February 16, 1987, the upper portion of which states:

"Philips Medical Systems, Inc. is pleased to submit the following quotation consisting of 2 pages and offers to sell the product described herein at the prices and upon the terms stated subject to Buyer's acceptance of this quotation and the terms on the face and reverse hereof on or before the ———— day of ——— 19—— or within thirty (30) days of receipt of quotation if no date is indicated."

This document describes the S–5 system, indicates a total contract price of $1,690,000, and provides for terms of delivery and payment. It was signed by Jorge Cruz for NAPC and by Dr. Luis E. Bonet for Radiology on February 18, 1987. Notes on the second page state that 1) the order is considered firm but contingent to final approval of the certificate of need; 2) Puerto Rico taxes are not included and must be paid by the customer, if applicable; 3) PCC would provide the financing of the system.

3. On or around March 9, 1988, NAPC requested that the FDA classification of the S–5 and S–15 be changed from a Class III to a Class II device.

4. On July 29, 1988, the FDA approved the reclassification of the S–5 from a Class III to a Class II device, indicating that "Class II controls [were] adequate to reasonably assure safety and effectiveness."

5. On August 11, 1988, NAPC and Radiology entered into a Service Agreement for the ".5T Gyroscan Unit—PMSI OA # 27401—Cryogen Supplies."

6. On January 12, 1989, representatives from NAPC and Radiology signed a document that indicated that the equipment described in OA # 27401 [the S–5 unit] (except for a cardiac package) had been installed at Radiology's facilities and was available for use as of December 30, 1988.

7. On February 15, 1989, NAPC submitted its "Notification of Intent to Market" declaration for the T–5 as a Class II device. The FDA found the device to be substantially equivalent to devices that had been reclassified in accordance with section 513(e) or 513(f) of the Act, and informed NAPC that it therefore could market the device subject to the general control provisions of the Act and

subject to present or future performance standards applicable to Class II devices.

8. Dr. González, a consultant to Radiology, went to the RSNA Convention in December of 1988, in Chicago, Illinois, and at Radiology's request, visited the NAPC booth to see what it was showing in terms of the latest in MRI technology.

9. NAPC issued press releases regarding the T–5 marked "Chicago, November 27, 1988."

## IV. DISCUSSION

The Act classifies medical devices into three categories based on the risk they pose to the public. Devices that present no unreasonable risk of illness or injury are designated Class I and are subject only to minimal regulation by "general controls." 21 U.S.C. § 360c(a)(1)(A). Devices that are potentially more harmful are designated Class II. Class II devices may be marketed without advance approval from the FDA but manufacturers of such devices must comply with federal performance regulations known as "special controls." 21 U.S.C. § 360c(a)(1)(B). Class III devices are those that either "present a potential unreasonable risk of illness or injury," or which are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health." 21 U.S.C. § 360c(a)(1)(C). Before a new Class III device may be introduced to the market, the manufacturer must demonstrate to the FDA that it is both safe and effective. This process is known as premarket approval.

The Act contains an express preemption provision relating to state regulation of medical devices. 21 U.S.C. § 360k(a) states:

(a) **General rule**

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

Pursuant to its rulemaking authority, the FDA has promulgated the following regulation with respect to preemption:

State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not "requirements applicable to a device" within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

21 C.F.R. § 808.1(d)(1).

■ Relying on 21 C.F.R. §§ 807.87 (Class II devices) and 807.94 (Class III devices), NAPC argues that the FDA expressly forbids the marketing of a Class II and III devices until the premarket approval process is completed, and therefore to require it to offer the T–5 before FDA approval is to add a requirement in derogation of § 360k(a). Furthermore, NAPC asserts that the FDA has promulgated performance standards applicable to electronic products, including MRI equipment, see 21 C.F.R. Part 1010, and therefore any performance requirements not included in those regulations (e.g., up-

gradeability, state-of-the-art) are preempted by the MDA.

"While the pre-emptive language of § 360k(a) means that we need not go beyond that language to determine whether Congress intended the [Medical Device Amendments] to pre-empt at least some state law, we must nonetheless identify the domain expressly pre-empted by that language." *Medtronic,* —— U.S. at ——, 116 S.Ct. at 2250 (holding that common law negligent design, manufacturing and labeling claims were not preempted by the Act) (internal citations and quotations omitted). Any understanding of the scope of a pre-emption statute must rest primarily on the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law. *Id.* —— U.S. at ——, 116 S.Ct. at 2251.

The primary issue motivating enactment of the Medical Devices Act was the safety of those who use medical devices. *Id.* —— U.S. at ——, 116 S.Ct. at 2253. Congress was not concerned with the business relations between manufacturers of medical devices and the hospitals, clinics and doctors who purchase such devices. Indeed, the cases cited by defendant in its brief are product liability cases brought by patients who were harmed by medical devices, not contract disputes between manufacturers and health care providers.[3] A jury finding that NAPC had a duty to disclose to Radiology the impending introduction of new technology such as that employed in the T–5, and/or whether upgrades to the S–5 would be available for the life of the machine, would not impose a "requirement applicable to a device" within the meaning of 21 U.S.C. § 360k(a). Such a finding would simply impose a requirement of general applicability that manufacturers of medical devices not engage in fraudulent practices in the sale of their merchandise to health providers.

We have reviewed 21 C.F.R. §§ 807.87 and 807.94 and find no express prohibition against marketing of a Class II device prior to FDA approval. The United States Supreme Court stated in *Medtronic* that Class II devices may be marketed without advance approval. —— U.S. at ——, 116 S.Ct. at 2246. The premarket notification procedures indicate that a person is required to submit a premarket notification submission to the FDA 90 days before "he proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device . . ." 21 C.F.R. § 807.81(a). Even assuming that commercial distribution could not begin without FDA approval, merely disclosing the existence of a new technology in development, which may lead to rapid obsolescence of a machine currently being sold, is not "introduction or delivery for introduction into interstate commerce for commercial distribution." NAPC was apparently of the same view, since it issued a press release regarding the T–5 prior to FDA approval, which indicated that the device was awaiting FDA clearance for commercial distribution (Exhibit P to NAPC's motion for summary judgment).

Nor will Radiology's claims allow the jury to impose a performance requirement such as, for example, that MRI equipment be upgradeable or state-of-the-art. Radiology's claims will merely allow a jury to find that manufacturers have a duty to accurately disclose the technological viability of their machines. Radiology's claims for fraud and breach of contract relate to NAPC's conduct in selling the S–5, not to the medical device per se. Accordingly, they are not preempted by the Act.

 NAPC also argues that Radiology has no action for rescission, resolution or annulment of contract, nor for breach of contract, because the only contract of sale for the S–5 was between PCC and NAPC. As an initial matter, this Court cannot rely on unauthenticated documents in deciding a motion for summary judgment, absent a showing that their contents can be proved by admissible evidence at trial. *See Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990). Radiology does not admit that the documents NAPC claims constitute its contract with PCC are authentic and NAPC has not attempted to show that they are admissi-

---

**3.** Moreover, many of these cases are probably no longer good law after *Medtronic.*

ble. However, even assuming the purchase order and order acknowledgment are admissible, NAPC is not entitled to judgment as a matter of law.

Contract requires three elements under the civil code: consent ("consentimiento"), object ("objeto"), and consideration ("causa"). *See* P.R. Laws Ann. tit. 31, § 3391 (1990). "A contract exists from the moment one or more persons consent to bind himself or themselves, with regard to another or others, to give something or to render some service." P.R. Laws Ann. tit. 31, § 3371 (1990).

Reviewing the "Gyroscan Quotation," dated February 16, 1987, we find it sufficient to create a material dispute regarding the existence of a contract between Radiology and NAPC. The parties' consent is reflected by their signatures, the object is the S–5, which is being given in exchange for valuable consideration. That PCC issued a purchase order to NAPC on February 19, 1987, or that NAPC issued an order acknowledgment to PCC on February 2, 1988, for internal business reasons, is insufficient to negate the possibility that a valid contract existed between Radiology and NAPC on February 16, 1987. The purchase order even provides that the S–5 is to be shipped to Radiology and states: *"Warranty:* As agreed between Radiology Institue [sic] and Philips Medical Systems, Inc. and to be exteded [sic] to Radiology Institute." Clearly, PCC was not in the business of purchasing MRI units. Therefore, to suggest that the contract of sale was between PCC and NAPC is to raise form over substance. NAPC has failed to show that it is entitled to judgment as a matter of law on the contract claims.

■ Likewise, there is no merit in NAPC's claim that Radiology's claim for breach of contract is actually an action for breach of warranty for hidden defects, governed by a six-month statute of limitations. Radiology's claim is not that the S–5 unit that it received contained some unperceived defect, but rather that NAPC misrepresented the technological viability of the machine. Radiology asserts that NAPC knew at the time it installed the S–5 that it did not intend to continue producing updates for that model. Without these updates, the machine could not remain competitive. The cases cited by defendant involve defects in the way merchandise was manufactured, packed, handled or stored that rendered them unfit for their intended purpose. In the case at bar, the S–5 could have continued serving its intended purpose in a competitive manner if NAPC had continued producing the necessary updates.

■ Nor are we convinced by NAPC's argument that Radiology's fraud claim is a tort action and is therefore subject to a one-year statute of limitations. Article 1210 of the Civil Code states that contracts are binding with regard not only to that expressly stipulated, "but also with regard to all the consequences which, according to their character, are in accordance with good faith, use and law." P.R. Laws Ann. tit. 31, § 3375 (1990). Article 1054 of the Civil Code state that "[t]hose who in fulfilling their obligations are guilty of fraud, negligence or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." P.R. Laws Ann. tit. 31, § 3018 (1990).[4] These provisions relate to contractual obligations and permit an action for fraud sounding in contract. *See Noble v. Corporación Insular de Seguros,* 738 F.2d 51 (1st Cir. 1984) (claim for damages arising from wrongful refusal to pay policy claim is a contract claim, not a tort claim); *Pennsylvania Ship Supply Co. v. Transcaribbean Maritime Corp.,* 825 F.Supp. 453 (D.P.R.1993) (Section 5141 does not apply where a contractual or quasi-contractual relation exists between the parties). The limitation period for contract claims in Puerto Rico is fifteen years. *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 911 n. 2 (1st Cir.1989). Therefore, Radiology's claims are not time-barred.

Finally, the cases NAPC cites in support of its proposition that the case should be dismissed on public policy grounds are inap-

---

**4.** In the original, Article 1054 states: "Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas."

posite. Once again, these are product liability cases that do not speak to the relations between manufacturers of medical devices and the health care providers that purchase them. The public policy of Puerto Rico favors fair dealing in the purchase and sale of goods. Such fair dealing need not stifle technological innovation.

For all these reasons, defendant NAPC's motion for summary judgment is hereby **DENIED.**

IT IS SO ORDERED.